991 So.2d 1126 (2008)
Whitni THIBODEAUX
v.
Gary KROUSE and Shelter Mutual Insurance Company.
No. 2007 CA 2557.
Court of Appeal of Louisiana, First Circuit.
June 6, 2008.
*1127 Mark D. Plaisance, Baker, LA, for Plaintiff/Appellee, Whitni Thibodeaux.
Brent E. Kinchen, Eric M. Barrilleaux, Baton Rouge, LA, for Defendants/Appellants, Gary Krouse and Shelter Mutual Insurance Company.
Before WHIPPLE, GUIDRY, and HUGHES, JJ.
GUIDRY, J.
A dog owner appeals a judgment in favor of a worker who was bitten by the family dog while performing work at the dog owner's home.

FACTS AND PROCEDURAL HISTORY
Sometime in late March or early April 2005, Gary Krouse contacted a company called Alumashield to construct a metal structure in his backyard to cover a recreational vehicle (RV). Alumashield, in turn, subcontracted the work to Arnold Enterprises, a company owned by Norman Arnold. On Friday, April 8, 2005, Mr. Arnold and a crew of workers that included his sister, Whitni Thibodeaux, began constructing a metal RV cover in Mr. Krouse's backyard. On that first day of construction, the workers set the poles for the frame of the RV cover in concrete and let the concrete solidify. A week later on the following Friday, the workers returned to put on the roof and began attaching walls to the structure. The next day, Saturday, April 16, 2005, the workers completed the structure.
The backyard where Mr. Krouse had the RV cover constructed was completely enclosed by fencing, consisting of chain link around one half of the yard and wood privacy fencing around the other half of the yard. The entrance gate to the fenced-in area was also composed of wood fencing. It was within the fenced backyard that Mr. Krouse kept the family pet, a dog named Jack.
On Saturday, April 16, 2005, the workers' last day of work, Ms. Thibodeaux arrived at the Krouse residence shortly after seven o'clock in the morning to help complete the work on the RV cover. On arriving at the house, Ms. Thibodeaux and another crew member, who was waiting in his vehicle in front of the Krouse residence when Ms. Thibodeaux arrived, walked straight to the backyard to begin work and found the gate to the backyard closed. Ms. Thibodeaux was bitten on the wrist by Jack, who was roaming free in the backyard, when she either opened the gate or *1128 entered the backyard. Mr. and Mrs. Krouse helped to clean and dress Ms. Thibodeaux's wounded wrist, and later they brought her to the Lake After Hours Clinic to receive further medical treatment.
As a consequence of the injury sustained, Ms. Thibodeaux filed a petition for damages against Mr. Krouse and his homeowner's insurer, Shelter Mutual Insurance Company (Defendants). The defendants denied all liability, and the matter proceeded to trial. Following a bench trial on the merits, the trial court rendered judgment in favor of Ms. Thibodeaux finding the defendants liable. The trial court found Ms. Thibodeaux to be comparatively at fault in causing her injuries and apportioned 20 percent fault to her and 80 percent fault to Mr. Krouse. The trial court also awarded Ms. Thibodeaux medical specials, subject to a credit for amounts already paid by the defendants, and $40,000.00 in general damages. The defendants suspensively appealed the judgment of the trial court.

ASSIGNMENTS OF ERROR
Appellants seek review of the trial court's judgment relative to the following alleged errors:
I. The trial court committed legal error in failing to require the Plaintiff to prove that Mr. Krouse's dog, enclosed within a secure fence, posed an unreasonable risk of harm to the Plaintiff.
II. The trial court erred in finding that the Plaintiff carried her burden of proving that Mr. Krouse's conduct was negligent under LSA-C.C. art. 2321.
III. The trial court erred in awarding Plaintiff forty thousand dollars ($40,000.00) in general damages given the medical evidence contained in the record and the lack of credibility with regard to the Plaintiff's testimony.

DISCUSSION
In their first assignment of error, defendants contend that the trial court erred in finding that the plaintiff established that Jack posed an unreasonable risk of harm. The law governing claims for damages caused by animals is La. C.C. art. 2321, which provides:
The owner of an animal is answerable for the damage caused by the animal. However, he is answerable for the damage only upon a showing that he knew or, in the exercise of reasonable care, should have known that his animal's behavior would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nonetheless, the owner of a dog is strictly liable for damages for injuries to persons or property caused by the dog and which the owner could have prevented and which did not result from the injured person's provocation of the dog. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. [Emphasis added.]
In addressing the requirements of establishing liability under this article, the Louisiana Supreme Court in Pepper v. Triplet, 03-0619, pp. 1-2 (La.1/21/04), 864 So.2d 181, 184, held:
[T]o establish a claim in strict liability against a dog owner under La. Civ.Code art. 2321 as amended in 1996, the plaintiff must prove that his person or property was damaged by the owner's dog, that the injuries could have been prevented by the owner, and that the injuries did not result from the injured person's provocation of the dog. We hold that, to establish that the owner could *1129 have prevented the injuries under Article 2321, the plaintiff must show the dog presented an unreasonable risk of harm.
The criterion for determining whether a defendant has created or maintained an unreasonable risk of harm is a balancing of claims and interest, a weighing of the risk and gravity of harm, and a consideration of individual and societal rights and obligations. Pepper, 03-0619 at 21, 864 So.2d at 195-196. In deciding whether a risk is unreasonable, a judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community. Pepper, 03-0619 at 21, 864 So.2d at 196.
In the Pepper case, which involved a man entering his neighbor's fenced backyard where the neighbor's dog was allowed to roam free, the Court found that "until the plaintiff intentionally and knowingly entered the defendant's backyard without authority, the defendant's dog did not present an unreasonable risk of harm to the plaintiff or the public." Pepper, 03-0619 at 24, 864 So.2d at 197 (emphasis added). In that case, the Court found that the plaintiffs act of entering the neighbor's yard without the neighbors' permission and while the neighbors were away from home amounted to an act of civil trespass, defined as "the unlawful physical invasion of the property or possession of another." Moreover, the plaintiff could be considered a "trespasser," defined as "one who goes upon the property of another without the other's consent." Pepper, 03-0619 at 23, 864 So.2d at 197. The Court therefore found that the neighbor was not strictly liable for the injuries sustained by the plaintiff when he was bitten by the neighbor's dog while in the neighbor's fenced backyard retrieving his son's ball. Pepper, 03-0619 at 25, 864 So.2d at 198.
In its reasons for judgment, the trial court made the following findings of fact:
Ms. Thibodeaux testified that she went inside the gate on the morning of the incident and the dog bit her on her wrist. She testified that she did not provoke the dog in any way and the dog just bit her. There is a statement in some medical records that she allegedly stepped on the dog's foot and this caused the dog to bite her. It appears that even though that statement is in the record, nobody knows specifically who told it to the person who wrote the record.
... It appears that on the previous mornings that [the workers] were there, he went out and tied up the dog and they were able to work on the days that they worked with the dog being tied. Again, it is important to note that nobody saw the accident other than Ms. Thibodeaux.
Mr. Krouse has testified that on the prior occasions he would tie the dog up and then open the gates for the people to have access to the back yard. Ms. Thibodeaux having been in the yard on the previous occasions knew that Mr. Krouse or Mrs. Krouse were the ones who would go out and tie the dog up before the employees were able to go to work. Why she went inside on this day without first notifying the Krouses, we don't know.
Defendants, relying on Pepper, contend that because Jack was kept and encountered in the fenced backyard, the trial court erred in failing to find that Jack did not present an unreasonable risk of harm. The trial court did not specifically articulate whether it found Jack to present an unreasonable risk of harm. Still, the defendants' reliance on Pepper is misplaced, *1130 particularly in regard to whether Ms. Thibodeaux's presence in the fenced backyard was unauthorized or unlawful. From our review of the record, there is evidence that supports a finding that Ms. Thibodeaux's presence in the fenced backyard could be considered authorized and further evidence that would support a finding that Jack presented an unreasonable risk of harm.
According to the testimony presented at trial, Mr. Krouse was aware that employees of Arnold Enterprises would be returning on Saturday morning to complete the work on the RV cover. Ms. Thibodeaux and Mr. Krouse gave conflicting testimony regarding the specific time Mr. Krouse was told to expect the workers on that day; however, we cannot say that the trial court was manifestly erroneous in finding that Mr. Krouse knew to expect the employees at 7:00 a.m. on Saturday, April 16, 2005.[1]
Mr. Krouse testified that on the prior two occasions in which the employees were working in Krouses' backyard, he would be waiting for the workers when they arrived. He said he would then go tie Jack up or he would already have Jack tied up before the workers arrived. Nonetheless, he testified that his general habit with all visitors was to wait until the visitor arrived before he tied up the dog. It is undisputed that Jack was kept on a leash and not allowed to roam free in the backyard while the employees were working.
Ms. Thibodeaux testified that on the prior two work days, which were Fridays or weekdays, the gate to the backyard was open and Jack was tied up when she arrived. Although she also testified that the workers arrived together, she later explained that they "[p]retty much" arrived together and that "[i]t was pretty close." She testified that she drove to the job separately because she would take her children to school prior to coming to the Krouse residence. Mr. Krouse acknowledged that if the gate was open and Jack was on a leash when Ms. Thibodeaux arrived at his house, then she would have had to have "[shown] up after everybody else." Ms. Thibodeaux further testified that she thought the gate was closed on the date of her injury because the workers had left their tools and materials in the backyard under the partially completed RV cover on the second work day. Mr. Krouse confirmed her testimony regarding the tools and materials being left in the backyard.
As pertaining to any specific instructions Mr. Krouse gave Mr. Arnold and his workers regarding the dog and entering the backyard, Mr. Krouse testified that he told the owner of Alumashield that "[t]he only stipulation was that they could not come unless my wife or I were there, and the dog would be put on a chain before they came in the yard." He later reiterated that "[the workers] could not get in the back yard to work unless [Mr. Krouse or his wife] were there and had the dog on the chain." When asked if he had a conversation with Mr. Arnold before the workers began constructing the RV cover, Mr. Krouse stated uncertainly, "[y]es, I think so," But once the workers started *1131 constructing the RV cover, he indicated that he had told Mr, Arnold in front of the other workers on numerous occasions that he needed to be there when the workers came so he could chain up the dog before they began working.
While the foregoing testimony establishes that Mr. Krouse may have notified Mr. Arnold and his employees that either Mr. or Mrs. Krouse had to be present and that either Mr. or Mrs. Krouse would chain Jack up, the evidence is unclear whether the workers, including Ms. Thibodeaux, knew or should have known that they had to ascertain that Jack was tied up in addition to ascertaining that the Krouses were present. Neither Mr. Krouse's instructions nor the customary actions of the workers during the prior two work occasions clearly establish such an understanding, and absent such an understanding, it is debatable whether Ms. Thibodeaux's entrance or attempted entrance into the backyard on the date of her injury, while the Krouses were present, was unauthorized.
Thus, without a clear showing that Ms. Thibodeaux's presence in the backyard at the time of her injury was unauthorized, further consideration must be given to weighing the risk and gravity of harm and to considering the individual and societal rights and obligations presented in this case. The evidence in this case reveals that Mr. Krouse knew and had even invited Ms. Thibodeaux, as an employee of Arnold Enterprises, into his backyard, where he kept the family dog, to construct an RV cover. There was no evidence presented that anyone was told or warned to stay away from the dog. Ms. Thibodeaux testified that Mr. Krouse walked the dog around the yard, on a leash, while the workers were constructing the RV cover and that she even observed a co-worker petting the dog on one occasion prior to the dog-biting incident. Mr. Krouse additionally testified that the primary reason he placed the dog on a leash was not for safety reasons, but to keep the dog from interfering with the workers while they performed their work. Finally, the Krouses acknowledged that the dog had previously injured one of their children when it "scratched" the child on his arm with his tooth in response to the child grabbing the dog's collar.
We cannot say that Jack did not present an unreasonable risk of harm. No significant individual or societal rights or obligations are presented under these facts that would outweigh the risk and gravity of harm presented by Jack. While an area of a person's home that is barricaded from the general public should not be carelessly invaded in disregard of a person's ownership and privacy interests, such disregard was not shown in this case. Rather, Ms. Thibodeaux was present at the Krouses' home as an invitee, and she was unaware of any danger presented by the dog and was given no reason to fear or be wary of the dog, particularly in light of her experience being around the dog on the prior two work occasions.
Nevertheless, the defendants further argue that Mr. Krouse should not be found strictly liable for the injury caused by Jack because of evidence in Ms. Thibodeaux's medical records indicating that Jack bit Ms. Thibodeaux because she stepped on the dog's paw. Mr. and Mrs. Krouse testified that Ms. Thibodeaux had told them that she may have stepped on the dog's paw and that was why the dog bit her. Both Ms. Thibodeaux and Mrs. Krouse testified that they were unsure who told the medical providers that Ms. Thibodeaux had stepped on the dog's paw. Mrs. Krouse admitted being in the room with Ms. Thibodeaux while Ms. Thibodeaux was being examined and treated and said she *1132 could have been the one who told the medical providers that Ms. Thibodeaux had stepped on the dog's paw. Ms. Thibodeaux likewise testified that she could not remember who told the medical providers that she had stepped on the dog's paw, but she denied having stepped on the dog's paw or telling the Krouses that she had done so. She explained that the story was invented by the Krouses to keep the dog from being euthanized. The trial court apparently rejected the story that Ms. Thibodeaux had provoked the dog to bite her by stepping on its paw, stating "[i]t appears that even though that statement is in the record, nobody knows specifically who told it to the person who wrote the record."
Mr. and Mrs. Krouse further testified that Ms. Thibodeaux told them another "version" of what had occurred, wherein Ms. Thibodeaux allegedly stated that she had grabbed the dog by its collar and was attempting to tie it up when it bit her. Mr. Krouse also testified that when he went in the backyard to tie the dog up, he found fast food bags in the yard and said that Ms. Thibodeaux told him that she had brought the food into the backyard before the dog bit her. Ms. Thibodeaux, on the other hand, denied having entered the backyard or having told the Krouses that she grabbed the dog or brought food in the yard.[2]
Based on this conflicting testimony, we cannot say that the trial court was manifestly erroneous in finding that Ms. Thibodeaux did not provoke the dog to bite her. Consequently, based on our review of the evidence, we find the evidence is sufficient to establish that Ms. Thibodeaux was harmed by Mr. Krouse's dog, that the harm could have been prevented by Mr. Krouse, and that the harm was not provoked by Ms. Thibodeaux. Thus, we reject the defendants' contention that Ms. Thibodeaux failed to prove that Jack posed an unreasonable risk of harm in order to hold Mr. Krouse strictly liable for the injury suffered by Ms. Thibodeaux.
Having found that the evidence supports a finding of strict liability, we pretermit discussing the defendants' second assignment of error asserting that Mr. Krouse is not liable for Ms. Thibodeaux's injury under a theory of negligence.[3] Instead, we will consider the defendants' third assignment of error regarding the trial court's award of general damages.
When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. C.C. art.1999 and 2324.1. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime *1133 Overseas Corp., 623 So.2d 1257, 1260 (La. 1993), cert, denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976).
In considering Ms. Thibodeaux's injury, the trial court made the following observations:
The court had the occasion to observe the three puncture wounds that Ms. Thibodeaux pointed out that was caused by the dog bite. While it is true the court was able to observe those marks, I do not believe that they are as significant as Ms. Thibodeaux would have us to believe they are. I saw them and if she had not told me what they were, I certainly would not be concerned that they were disfiguring in any way. [There] were some puncture marks and certainly she has some remnants of those punctures, and she's going to have those I guess the rest of her life, but I don't think that they are disfiguring in any way.
The trial court then awarded Ms. Thibodeaux $40,000.00 in general damages after making these remarks.
At trial, Ms. Thibodeaux testified that the range of motion for her right wrist was more limited than that of her left wrist, which, according to her testimony, she demonstrated to the court. She further testified that her treating orthopedist, Dr. Thad S. Broussard, had advised her that she needed physical therapy to re-establish the full range of motion in her right wrist, but Shelter Insurance would not pay for the treatment. As for how the injury has impacted her day-to-day living, Ms. Thibodeaux testified that she can no longer play tennis, a sport she played competitively. She also stated that she has to use two hands to lift an iron skillet she uses for cooking and that if she does any gardening, "the next day I pay for it."
Ms. Thibodeaux's medical records reveal that on the date of her injury, she was treated at the Lake After Hours clinic. According to the medical documentation for that visit, three puncture wounds were observed, along with some bruising and swelling of the right wrist and hand. Nevertheless, it was noted that Ms. Thibodeaux had "[g]ood hand grasp and movement of wrist." Ms. Thibodeaux's wound was cleaned and bandaged, she was administered a tetanus shot, and she was given samples of a prescription medication during that visit.
A few weeks later, on May 10, 2005, Ms. Thibodeaux visited Dr. Broussard for further treatment of her injury. During that visit, Dr. Broussard observed that Ms. Thibodeaux had "difficulty pulling her wrist into a volar flexed position," but x-rays of her wrist showed no bony abnormality. Dr. Broussard found no infection in the wound, but observed that Ms. Thibodeaux's wound still had not healed. He gave Ms. Thibodeaux a "dynamic" brace to wear and prescribed therapy and anti-inflammatory medication to further treat her injury. In a follow-up visit two weeks later, Dr. Broussard noted that Ms. Thibodeaux still had some swelling around the "synovium and extensors," but found that she was "certainly more flexible" and that she had a "re-active scar" that was "just going to have to take some time to declare itself."
*1134 Ms. Thibodeaux's next visit to Dr. Broussard occurred three months later, at which time the doctor observed that Ms. Thibodeaux was not improving to his satisfaction because she still presented subjective complaints of "considerable difficulty" with her hand and wrist. He again recommended therapy and ordered an MRI scan of her wrist to look for any other pathology. In an October 2005 visit two months later, the doctor observed that Ms. Thibodeaux's wrist had not gotten any better, and that he would basically continue to work with her symptomatically. Dr. Broussard did not see Ms. Thibodeaux again until April 2006, at which time he noted that Ms. Thibodeaux's wrist was still bothering her and that the MRI scan he had requested was denied by insurance. Dr. Broussard then stated that he would again seek an MRI scan of Ms. Thibodeaux's wrist and would make additional recommendations pending re-evaluation as needed.
Ms. Thibodeaux's last visit with Dr. Broussard occurred on June 12, 2006. On that same date, an MRI scan of Ms. Thibodeaux's wrist was made, but the results of the scan are not included in her medical records. In the June 12, 2006 medical note, Dr. Broussard declared that Ms. Thibodeaux had reached maximum medical improvement, that her injury was "as good as she is going to get," and beyond symptomatic and supportive care, he had no new recommendations other than to note that her injury was not a surgical problem.
On reviewing Ms. Thibodeaux's testimony, pictures of her injury, and her medical records, we conclude that the trial court abused its discretion and awarded an excessive sum of general damages. Cases awarding general damages as high as the award received by Ms. Thibodeaux involved more severe injuries, multiple injuries, or surgical intervention. Further considering that Dr. Broussard made no assessment of permanent impairment or functional disability and Ms. Thibodeaux's sporadic medical treatment, we conclude that a $15,000.00 general damages award is more commensurate with the extent of Ms. Thibodeaux's pain and suffering as a result of her dog bite injury. See Brown v. Brookshire's Grocery Company, 38,216 (La.App. 2d Cir.3/12/04), 868 So.2d 297 ($15,000.00non-displaced fracture with no permanent impairment); Normand v. Hartford Fire Insurance Company, 538 So.2d 632 (La.App. 5th Cir.1988) ($15,000.00substandard treatment of puncture wound resulted in fifteen percent permanent function disability in right wrist); see also Coulon v. Wal-Mart Stores, Inc., 98-1141 (La.App. 1st Cir.5/14/99), 734 So.2d 916, writ denied, 99-1720 (La.9/24/99), 747 So.2d 1125 ($19,406.65fractured wrist and broken teeth; award included medical expenses); Parker v. Depriest, 94-0513 (La.App. 1st Cir.12/21/95), 666 So.2d 433, writs denied, 96-0202, 96-0218 (La.4/8/96), 671 So.2d 335 ($16,000.00past and future pain and suffering for injuries that included carpal tunnel syndrome and surgery); McAllister v. Champion Insurance Company, 602 So.2d 314 (La.App. 1st Cir.1992) ($8,500for traumatic ulnar nerve neuritis necessitating eight months treatment and pain persisting at time of trial).

CONCLUSION
Accordingly, we amend the general damages award to reduce the award to $15,000.00. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are to be equally borne by the parties.
AMENDED, AND AS AMENDED, AFFIRMED.
HUGHES, J., dissents in part and concurs in part.
*1135 HUGHES, J., dissenting in part and concurring in part.
I respectfully dissent as to the finding of fault on the part of the dog and his owners. I will concur with the majority's conclusions regarding damages.
NOTES
[1] At trial, Ms. Thibodeaux testified that her brother told Mr. Krouse that the workers would arrive at 7:00 a.m. on Saturday morning and that she arrived at Mr. Krouse's home a few minutes after 7:00 a.m. on that day. Mr. Krouse, however, testified that Mr. Arnold told him that the workers would arrive around 7:30 a.m. Under the manifest error standard of review, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal where the record merely demonstrates conflicting testimony as to the facts at issue, and the fact finder chooses to believe one version, rather that the other. Salvant v. State, 05-2126, p. 17 (La.7/6/06), 935 So.2d 646, 658.
[2] We further observe another conflict in the parties' testimony that could have influenced the trial court in its credibility determinations. Mr. Krouse testified that Jack stood about 28 inches tall, standing on all four paws, but weighed only 25 to 30 pounds. Ms. Thibodeaux agreed with Mr. Krouse's statement of height, but said that the dog weighed closer to seventy pounds. Mrs. Krouse agreed with Ms. Thibodeaux and explained that her husband misrepresented the dog's weight because he did not take the dog to the veterinarian.
[3] We believe it is important to observe that although the defendants have not challenged the allocation of fault in this matter, our state supreme court has held that "comparative fault applies in cases such as this where a domesticated animal inflicts injuries for which its owner is held liable under art. 2321. It seems only fair that the damages recovered by negligent victims in dog bite cases should be reduced by their percentage of fault." Howard v. Allstate Insurance Company, 520 So.2d 715, 718-719 (La. 1988).